Jay B. Kasner
Scott D. Musoff
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Tel: 212-735-3000
Fax: 212-735-2000

*Attorneys for Merrill Lynch & Co., Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

OPERATIVE PLASTERERS & CEMENT
MASONS LOCAL 262 PENSION AND ANNUITY :
FUNDS, Derivatively On Behalf of Nominal
Defendant MERRILL LYNCH & CO., INC.,

        Plaintiff,

        vs.         :

E. STANLEY O'NEAL, AHMASS L. FAKAHANY, :
GREGORY J. FLEMING, JEFFREY N.
EDWARDS, CAROL T. CHRIST, ARMANDO D. :
CODINA, VIRGIS W. COLBERT, ALBERTO
CRIBIORE, JOHN D. FINNEGAN, JUDITH :
MAYHEW JONAS, JOSEPH W. PRUEHER, ANN
N. REESE, CHARLES O ROSOTTI, :

        Defendants,         :

        and         :

MERRILL LYNCH & CO., INC.,

        Nominal Defendant.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

07 CV 11085

## NOTICE OF REMOVAL

TO:    UNITED STATES DISTRICT COURT FOR THE
       SOUTHERN DISTRICT OF NEW YORK
       Daniel Patrick Moynihan Courthouse
       500 Pearl Street
       New York, New York 10007

RECEIVED
DEC 0 7 2007
U.S.D.C. S.D.N.Y.
CASHIERS

PLEASE TAKE NOTICE that for the reasons set forth below, Defendant Merrill Lynch & Co., Inc. ("Merrill Lynch") files this Notice of Removal to remove this action from the Supreme Court of the State of New York to the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1441.

In support of the Notice of Removal, Merrill Lynch states as follows:

## BACKGROUND TO THE NOTICE OF REMOVAL

1.      On or about November 21, 2007, Plaintiff commenced this action by filing a Complaint in the Supreme Court of the State of New York, County of New York, Index No. 07/603860, styled *Operative Plasterers & Cement Masons Local 262 Pension and Annuity Funds v. E. Stanley O'Neal, Ahmass L. Fakahany, Gregory J. Fleming, Jeffrey N. Edwards, Carol T. Christ, Armando D. Codina, Virgis W. Colbert, Alberto Cribiore, John D. Finnegan, Judith Mayhew Jonas, Joseph W. Prueher, Ann N. Reese, Charles O Rosotti (sic) and Merrill Lynch & Co., Inc.* (the "State Court Action"). True and correct copies of the Complaint (the "Compl.") and Summons received by Merrill Lynch are attached hereto as Exhibit A.

2.      The Complaint purports to assert claims derivatively on behalf of Merrill Lynch for Breach of Fiduciary Duty, Gross Mismanagement, Contribution and Indemnification, Abuse of Control, Waste of Corporate Assets, and Aiding and Abetting Breach of Fiduciary Duty based upon alleged conduct during the period February 26, 2007 through October 24, 2007 in connection with, among other things, Merrill Lynch's financial statements filed with the Securities and Exchange Commission.

3.      The Complaint alleges, *inter alia*, that on October 5, 2007, Merrill Lynch issued a press release announcing, among other things, that it "would write down the

value of its [collateralized debt obligations ("CDO")] portfolio by $4.5 billion, and estimated that it would lose as much as 50 cents per share." (Compl. ¶ 53).

4.     The Complaint further alleges that on October 24, 2007, Merrill Lynch "issued a press release announcing that the Company would take a third-quarter charge of $8 billion instead of $5 billion." (*Id.* ¶ 55).

5.     On October 30, 2007, a purported securities class action asserting claims based on Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b-5 promulgated thereunder was commenced in the United States District Court for the Southern District of New York against Merrill Lynch and former CEO E. Stanley O'Neal, Co-Presidents and Co-COOs Ahmass L. Fakahany and Gregory J. Fleming and CFO Jeffrey N. Edwards.   This action is styled *Life Enrichment Foundation v. Merrill Lynch & Co., Inc., et al.*, 07 CV 9633 (LBS).  Among other things, the allegations in the complaint in the *Life Enrichment* action center on purportedly false and misleading statements and/or omissions concerning Merrill Lynch's business and financial results with respect to CDO and subprime exposure issued during an alleged class period of February 26, 2007 through and including October 23, 2007. Two other substantially identical putative securities class actions were filed on November 6, 2007 and December 4, 2007 (collectively, all three actions are referred to as the "Federal Securities Actions").   These subsequently filed actions are styled *Savena v. Merrill Lynch & Co., Inc.*, 07 CV 9837 (LBS) and *Kosseff v. Merrill Lynch & Co., Inc., et al.*, 07 CV 10984.

6.     Additionally, two purported shareholder derivative actions have been commenced in the Southern District of New York on November 1, 2007 and November 8,

2007 against Merrill Lynch (as nominal defendant) and the same defendants that were subsequently named in the State Court Action (the "Federal Derivative Actions"). The Federal Derivative Actions are styled *Arthur v. O'Neal, et al.*, 07 CV 9696 (LBS) and *Loveman v. O'Neal, et al.*, 07 CV 9888 (LBS). The Federal Derivative Actions are based on essentially the same allegations as the Federal Securities Actions, *i.e.*, that purportedly false and misleading statements and/or omissions concerning Merrill Lynch's business and financial results with respect to CDO and subprime exposure were issued by defendants.

7.    In addition to the Federal Securities Actions and the Federal Derivative Actions, multiple purported class actions asserting violations of § 502(a) of the Employee Retirement Income Security Act ("ERISA") arising out of the same core allegations have also been commenced in the Southern District of New York (the "ERISA Actions"). *See, e.g., Gidaro v. Merrill Lynch & Co., Inc., et al.*, 07 CV 10273 (LBS).

8.    For the reasons explained below, the State Court Action is properly removable under 28 U.S.C. §§ 1331 and 1441 because the claims asserted therein arise under the laws of the United States.

## FEDERAL QUESTION JURISDICTION

9.    The State Court Action is removable under 28 U.S.C. §§ 1331 and 1441 because the claims asserted therein arise under the Securities Exchange Act of 1934.

10.    Among other things, plaintiffs' third cause of action seeks contribution and indemnification on Merrill Lynch's behalf from the individual defendants for Merrill Lynch's alleged liability "in connection with all such claims that have been, are on may in the future be asserted against Merrill Lynch by virtue of the Defendants' misconduct."

(Compl. ¶ 91)  The complaint further alleges that "Merrill Lynch is alleged to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein that give rise to Defendants' liability to Merrill Lynch."  (*Id.* ¶ 90) Amongst the claims for which plaintiff apparently seeks contribution and indemnification are "major securities fraud class action lawsuits by defrauded investors." (*Id.* ¶ 78)  The actions to which plaintiff appears to refer assert claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  (*See* ¶ 5 herein.)  Therefore, plaintiff's contribution and indemnification claim asserted is an issue of federal law.  *See* 15 U.S.C. § 78u-4(f); *see also Gross v. Weingarten*, 217 F.3d 208, 224 (4th Cir. 2000) (citing *Musick, Peeler & Garrett v. Employers Ins. of Wausau*, 508 U.S. 286 (1993)).

11.    Furthermore, whether and to what extent indemnification and/or contribution are available in connection with the ERISA Actions are issues of federal law. *See In re Masters Mates & Pilots Pension Plan and IRAP Litigation,* 957 F.2d 1020, 1027 (2d Cir. 1992).

12.    Additional paragraphs of plaintiff's complaint reflect that it raises federal questions.  For example, paragraph 78 alleges in part that "[a]s a result of the Defendants' unlawful course of conduct and breaches of fiduciary duty, Merrill Lynch has sustained substantial economic losses [and], is the subject of major securities fraud class action lawsuits by defrauded investors. . ." and that "[b]y reason of the foregoing, Merrill Lynch was damaged." (Id. ¶¶ 78, 80); see also, e.g., Compl. ¶ 98 ("[a]s a result of Defendants' breaches of fiduciary duties, Merrill Lynch . . . has incurred significant potential liability for legal costs, penalties, fines and/or legal fees in connection with the defense of

Defendants' unlawful course of conduct complained of herein."). *See Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308 (2005).

## THE REMOVAL PREREQUISITES HAVE BEEN SATISFIED

13.    Pursuant to 28 U.S.C. § 1446(b), this Notice of Removal is being filed within thirty days of service on Merrill Lynch and is, therefore, timely. *See Murphy Bros. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344 (1999).

14.    True and correct copies of all process, pleadings and orders served upon Merrill Lynch in the State Court Action are attached here as Exhibit A.

15.    All other defendants consent to removal.  These consents are attached hereto as Exhibit B.

16.    The Southern District of New York is the district in which the Supreme Court of New York, County of New York is located and in which plaintiff filed its complaint and the action is pending.

17.    In accordance with 28 U.S.C. § 1446(d), promptly after filing this Notice of Removal, Merrill Lynch will give written notice to all adverse parties and will file a copy of this Notice of Removal with the Supreme Court of the State of New York, County of New York.

18.    No previous application has been made by Merrill Lynch for this or similar relief.

WHEREFORE, Merrill Lynch submits that this action is now properly removed from the Supreme Court of the State of New York, County of New York and is properly before this District Court and that all further actions should take place before this Court.

Dated: New York, New York
      December 7, 2007

                             Jay B. Kasner
                             Scott D. Musoff
                             SKADDEN, ARPS, SLATE,
                                MEAGHER & FLOM LLP
                             Four Times Square
                             New York, New York 10036
                             Tel: 212-735-3000
                             Fax: 212-735-2000

                             *Attorneys for Merrill Lynch & Co., Inc.*

Exhibit A

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF NEW YORK, COMMERCIAL DIVISION

OPERATIVE PLASTERERS & CEMENT MASONS LOCAL 262 PENSION AND ANNUITY FUNDS, Derivatively On Behalf of Nominal Defendant MERRILL LYNCH & CO., INC.,

        Plaintiff,

        vs.

E. STANLEY O'NEAL, AHMASS L. FAKAHANY, GREGORY J. FLEMING, JEFFREY N. EDWARDS, CAROL T. CHRIST, ARMANDO D. CODINA, VIRGIS W. COLBERT, ALBERTO CRIBIORE, JOHN D. FINNEGAN, JUDITH MAYHEW JONAS, JOSEPH W. PRUEHER, ANN N. REESE, CHARLES O ROSOTTI,

        Defendants,

        and

MERRILL LYNCH & CO., INC.,

        Nominal Defendant.

CASE NO. 07603860

**SUMMONS**

NEW YORK COUNTY CLERK'S OFFICE

NOV 2 1 2007

NOT COMPARED WITH COPY FILE

TO THE ABOVE NAMED DEFENDANTS:

    YOU ARE HEREBY SUMMONED to answer the shareholder's derivative complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the plaintiffs' attorneys within twenty days after service of this summons, exclusive of the date of service (or within thirty days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: November 21, 2007

THE BRUALDI LAW FIRM P.C.

_____
Richard B. Brualdi
Gaitri Boodhoo
Ayesha N. Onyekwelu
29 Broadway, Suite 2400
New York, New York 10006
Telephone: (212) 952-0602
Facsimile: (212) 952-0608

*Attorneys for Plaintiff*

**SAXENA WHITE P.A.**
Maya Saxena
Joseph E. White III
2424 North Federal Highway
Suite 257
Boca Raton, FL 33431
Tel: 561.394.3399
Fax: 561.394.3082

*Of Counsel*

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK, COMMERCIAL DIVISION**

OPERATIVE PLASTERERS & CEMENT ) CASE NO. 07603860
MASONS LOCAL 262 PENSION AND ANNUITY )
FUNDS, Derivatively On Behalf of Nominal )
Defendant MERRILL LYNCH & CO., INC., ) VERIFIED SHAREHOLDER'S
) DERIVATIVE COMPLAINT
Plaintiff, )
)
vs. )
)
E. STANLEY O'NEAL, AHMASS L. )
FAKAHANY, GREGORY J. FLEMING, JEFFREY )
N. EDWARDS, CAROL T. CHRIST, ARMANDO )
D. CODINA, VIRGIS W. COLBERT, ALBERTO )
CRIBIORE, JOHN D. FINNEGAN, JUDITH )
MAYHEW JONAS, JOSEPH W. PRUEHER, ANN )
N. REESE, CHARLES O ROSOTTI, )
)
Defendants, )
)
and )
)
MERRILL LYNCH & CO., INC., )
)
Nominal Defendant. )
_____ )

NEW YORK
COUNTY CLERK'S OFFICE

NOV 2 1 2007

NOT COMPARED
WITH COPY FILE

## VERIFIED SHAREHOLDER'S DERIVATIVE COMPLAINT

Plaintiff Operative Plasterers & Cement Masons Local 262 Pension and Annuity Funds

("Plaintiff"), by and through its undersigned attorneys, brings this action derivatively on behalf

of Merrill Lynch & Co., Inc. ("Merrill Lynch" or the "Company"), and alleges based upon

personal knowledge as to allegations pertaining to Plaintiff, and as to all other matters upon

information and belief, as follows:

## NATURE OF THE ACTION

1.     This is a shareholder's derivative action brought for the benefit of Nominal

Defendant Merrill Lynch against certain members of the Company's Board of Directors (the

"Board") and certain of its executive officers seeking to remedy Defendants' violations of New York state law, including breaches of fiduciary duties owed to the Company, during the period February 26, 2007 through October 24, 2007 (the "Relevant Period").

2.     Merrill Lynch is a holding company that, through its subsidiaries and affiliates, provides investment, financing, advisory, insurance, banking, and related products and services on a global basis.    These services include securities brokerage, trading and underwriting, investment banking, asset management, private equity investment and insurance underwriting.

3.     Defendants' breaches of fiduciary duty arise out of a scheme and wrongful course of conduct whereby Defendants (i) caused Merrill Lynch to engage in unsound investment practices relating to the Company's position as the lead underwriter of billions of dollars of Collateralized Debt Offerings ("CDOs") secured by high-risk subprime mortgages; (ii) caused the Company to disseminate materially false and misleading statements during the Relevant Period, and omit material information necessary to make such statements not false and misleading, in order to artificially inflate the price of the Company's stock; and (iii) caused the Company to engage in such unsound lending practices so as to unjustly enrich themselves through substantial executive compensation packages tied to the Company's financial results and performance, including a retirement package of $160 million awarded to Defendant E. Stanley O'Neal ("O'Neal") at a time when many observers felt that Defendant O'Neal should have been fired.

4.     As a result of Defendants' unlawful course of conduct and breaches of fiduciary duty, Merrill Lynch has sustained substantial financial losses, including a massive write down of more than $8 billion in the value of the Company's CDOs and other investments, as well as a $2.2 billion loss for the Company in the third quarter of 2007, with more losses expected to come

2

in the fourth quarter of 2007. In addition, Merrill Lynch has sustained significant damages to its reputation and goodwill as a result of Defendants' breaches of their fiduciary duties.

5.      Because a majority of Merrill Lynch's directors will not authorize a lawsuit against themselves, Plaintiff brings this action on behalf of Merrill Lynch to, among other things, recover damages caused by Defendants' unlawful course of conduct and breaches of fiduciary duty.

## JURISDICTION AND VENUE

6.      This court has jurisdiction over defendants and the subject matter of this action because defendants transact business within this State, and derivative claims on behalf of corporations against their wayward directors and officers for breach of their fiduciary obligations owed to the corporation are governed exclusively by state law. In addition, Merrill Lynch maintains its main office and principal place of business in the State of New York.

7.      This Court retains general jurisdiction over each named Defendant who is a resident of New York. Additionally, this Court has specific jurisdiction over each named non-resident Defendant because these Defendants maintain sufficient minimum contacts with New York to render jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. Merrill Lynch is headquartered in New York, and because the allegations contained herein are brought derivatively on behalf of Merrill Lynch, Defendants' conduct was purposefully directed at New York. Finally, exercising jurisdiction over any non-resident Defendant is reasonable under these circumstances.

8.      Venue is proper in this Court because, although Merrill Lynch is a Delaware corporation, one or more of the Defendants either resides in or maintains executive offices in this County, a substantial portion of the transactions and wrongs complained of herein, including the

3

Defendants' primary participation in the wrongful acts alleged herein, as well as the aiding and abetting and conspiracy of violations of fiduciary duties owed to Merrill Lynch, occurred in this County. In addition, Defendants have received substantial compensation in this County by doing business here and engaging in numerous activities that had an effect in this County, and the Company's Board almost always meets in this County.

## PARTIES

9.      Plaintiff Operative Plasterers & Cement Masons Local 262 Pension and Annuity Funds is, and at all relevant times was, a shareholder of nominal defendant Merrill Lynch.

10.     Nominal defendant Merrill Lynch is incorporated under the laws of Delaware with its principal executive offices located at 250 Vesey Street, 4 World Financial Center, New York, New York 10080.

11.     Defendant O'Neal, until his retirement from the Company on October 30, 2007, was a member of Merrill Lynch's Board of Directors since 2001, the Chairman of the Board since 2003, and the Chief Executive Officer since 2002. In addition, Defendant O'Neal also served as the Company's President and Chief Executive Officer since 2002. Defendant O'Neal is believed to be a citizen and a resident of New York.

12.     Defendant Ahmass L. Fakahany ("Fakahany") is, and at all relevant times was, President and Chief Executive Officer of Merrill Lynch. Defendant Fakahany is believed to be a citizen and a resident of New York.

13.     Defendant Gregory J. Fleming ("Fleming") is, and at all relevant times was, President and Chief Operating Officer of Merrill Lynch. Defendant Fleming is believed to be a citizen and a resident of New York.

4

14.      Defendant Jeffrey N. Edwards ("Edwards") is, and at all relevant times was, Senior Vice President and Chief Financial Officer of Merrill Lynch. Defendant Edwards is believed to be a citizen and a resident of New York.

15.      Defendants O'Neal, Fakahany, Fleming and Edwards are sometimes collectively referred to herein as the "Officer Defendants".

16.      Defendant Carol T. Christ ("Christ") has served as a director of the Company since 2007. Defendant Christ is believed to be a citizen and a resident of Massachusetts.

17.      Defendant Armando M. Codina ("Codina") has served as a director of the Company since 2005. Defendant Codina is believed to be a citizen and a resident of Florida.

18.      Defendant Virgis W. Colbert ("Colbert") has served as a director of the Company since 2006. Defendant Colbert is believed to be a citizen and a resident of Wisconsin.

19.      Defendant Alberto Cribiore ("Cribiore") has served as a director of the Company since 2003. Defendant Cribiore is believed to be a citizen and a resident of New York.

20.      Defendant John D. Finnegan ("Finnegan") has served as a director of the Company since 2004. Defendant Finnegan is believed to be a citizen and a resident of New Jersey.

21.      Defendant Judith Mayhew Jonas ("Jonas") has served as a director of the Company since 2006. Defendant Jonas is believed to be a citizen and a resident of the United Kingdom.

22.      Defendant Joseph W. Prueher ("Prueher") has served as a director of the Company since 2001. Defendant Prueher is believed to be a citizen and a resident of Virginia.

23.      Defendant Ann N. Reese ("Reese") has served as a director of the Company since 2004. Defendant Reese is believed to be a citizen and a resident of New York.

24.    Defendant Charles O. Rossotti ("Rossotti") has served as a director of the Company since 2004. Defendant Rossotti is believed to be a citizen and a resident of Washington D.C.

25.    Defendants Christ, Codina, Colbert, Cribiore, Finnegan, Jonas, Prueher, Reese and Rossotti are sometimes collectively referred to herein as the "Director Defendants".

26.    The Officer Defendants and the Director Defendants are sometimes collectively referred to herein as the "Individual Defendants".

## DUTIES OF THE INDIVIDUAL DEFENDANTS

27.    Because of the Individual Defendants' positions with the Company, they had access to adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

28.    Each of the Individual Defendants, by virtue of their positions as directors and/or officers of the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and/or was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Such Defendants were involved in drafting, producing, reviewing, disseminating, approving, ratifying and/or recklessly permitting the dissemination of the false and misleading statements and

6

information alleged herein. Defendants were aware or recklessly disregarded that false and misleading statements were being issued regarding the Company, and approved or ratified these statements. In addition, Defendants were in a position and had a duty to implement procedures and controls to prevent the false and misleading statements as well as the Company's violations of New York state law as alleged herein, but completely abdicated their oversight responsibilities to the Company by failing to do so.

29.    As further alleged herein, Merrill Lynch's current Board of Directors is unable to make an impartial determination as to whether to institute legal proceedings to redress the wrongful conduct alleged herein because there is a substantial likelihood that a majority of its members would be found liable for non-exculpated breaches of their fiduciary duties to the Company and shareholders by participating or acquiescing in the wrongdoing alleged herein and/or completely failing to perform their oversight duties to the Company, and through their systematic failure to assure that a reasonable information and reporting system existed.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

30.    In committing the wrongful acts complained of herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective fiduciary duties.

31.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was disseminating materially misleading statements and omissions during the

Relevant Period; (ii) maintain the Individual Defendants' directorial and/or executive positions at Merrill Lynch and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of Merrill Lynch, regarding the Individual Defendants' management of Merrill Lynch's operations, the Company's financial health and stability, and the Company's future business prospects.  In furtherance of this plan, the Individual Defendants collectively and individually took the actions set forth herein.

32.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct during the Relevant Period.  During this time, the Individual Defendants caused the Company to conceal its misrepresentation of its true business prospects. In addition, Defendants also made other specific, improper and misleading statements about Merrill Lynch's financial performance and future business prospects, as further alleged herein.

33.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of New York state law, breaches of fiduciary duty, waste of corporate assets and abuse of control; to conceal material adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of Merrill Lynch common stock in order to profit from and protect their positions as directors and/or executives of the Company and the benefits they obtained as a result.

34.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its business prospects and financial results.  Because the actions complained of herein occurred under the authority of the Board, each of the Individual

8

Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct alleged herein.

35.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing alleged herein, each of the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

### Background

36.    Merrill Lynch, together with its subsidiaries, provides broker-dealer, investment banking, financing, wealth management, advisory, asset management, insurance, lending, and related products and services worldwide.  The Company's Institutional Business segment provides equity, debt, and commodities trading, capital market services, investment banking, and advisory services to corporations, financial institutions, governments, and institutional investors. This segment also provides clients with financing, securities clearing, settlement, and custody services, and engages in principal and private equity investing.  In addition, Merrill Lynch offers underwritings and private placements of equity, debt, and related securities, lending and other financing activities, and advisory services to clients on strategic issues, valuation, mergers, acquisitions, and restructurings.

37.    The Company's Retail Wealth Management segment provides brokerage, investment advisory, and financial planning services.  This segment also offers commission and fee-based investment accounts, banking, cash management, and credit services, trust and

generational planning, retirement services, and insurance products to individuals, small-to mid-size businesses, and employee benefit plans. Merrill Lynch also provides various research services through its Global Securities Research & Economics Group. This group distributes research focusing on fundamental equity research, fixed income and equity-linked research, economics and foreign exchange research, and investment strategy research.

38.    Merrill Lynch has operations primarily in the United States, Canada, Europe, the Middle East, Africa, the Pacific Rim, and Latin America. The Company was founded in 1820 and is headquartered in New York, New York.

39.    In the years leading up to the Relevant Period, Merrill Lynch underwent a transformation in which the Company focused on fiscal discipline and cutting costs. In order to effectuate these changes, Defendant O'Neal, after assuming his position as Chief Executive Officer of the Company in 2002, led the Company to substantially cut back its fixed-income business and expand significantly into riskier CDOs for the lucrative fees these investments generated. Generally, CDOs are investment vehicles that buy securities backed by, among other things, mortgages, auto loans, and corporate bonds. Although this shift led to increased short-term revenue for Merrill Lynch, it also exposed the Company to substantial risk since a significant portion of Merrill Lynch's CDOs were backed by high-risk subprime mortgages.

40.    O'Neal was successful in his campaign to shift the business strategy of Merrill Lynch as, one year after taking the reins of the Company, Merrill Lynch became the largest underwriter of CDOs in the world. Indeed, the Company soared from 15th place among the rankings of CDO underwriters in 2002, with just over $2 billion in CDO deals, to the No. 1 spot in 2004 with $19 billion. By 2005, the Company was underwriting $35 billion, of which $14 billion was backed by high-risk subprime mortgages. This trend continued well into 2006 and

10

mid-2007, as Merrill Lynch earned over $800 million in underwriting fees from CDO transactions worth $93 billion.

41.    Although the Company was earning lucrative fees on its CDO deals, Merrill Lynch's continued push in CDO investments exposed the Company to major risk of lower earnings amidst warnings from analysts that Companies with substantial subprime exposure could face significant financial problems should the subprime market collapse. However, since the Officer Defendants' compensation was tied to the Company's financial performance, the Company ignored these warnings at a time when most brokerage firms were decreasing their CDO investments and their subprime exposure.

42.    Merrill Lynch's top officers, including Defendant O'Neal, were well aware of the problems with CDOs in the Company's portfolio. Analysts and subordinates within the Company were advising O'Neal that CDOs were being downgraded as signs of trouble in the housing market abounded. Despite these warnings, Defendant O'Neal and the other Officer Defendants continued to push forward with the high-risk business strategy in order to boost the Company's earnings and increase their substantial executive compensation. For instance, the Officer Defendants collected the following compensation packages in 2006:

|  | Salary | Bonus | Stock Awards | Option Awards | Deferred Comp | Other | Total |
|---|---|---|---|---|---|---|---|
| O'Neal | $700,000 | $18,500,000 | $66,780,100 | $3,070,531 | $1,949,455 | $375,298 | $91,375,384 |
| Edwards | 270,833 | 5,625,000 | 21,974,472 | 366,577 |  | 14,719 | 28,251,601 |
| Fleming | 350,000 | 13,250,000 | 19,526,191 |  | 165,375 | 119,875 | 33,411,441 |
| Fakahany | 350,000 | 11,650,000 | 38,190,936 | 560,378 |  | 102,834 | 50,854,148 |

43.    When the predictions of a collapse in the housing market came to fruition, Merrill Lynch became one of the largest casualties. By June 2007, the Company held $32 billion worth of CDOs, which it was trying desperately to unload. However, Merrill Lynch was able to sell

only a little more than half of its holdings, and by the end of the third quarter of 2007 the

Company was still holding $15 billion in CDO investments.

### False and Misleading Statements During the Relevant Period

44.    During the Relevant Period, the Individual Defendants caused or allowed the

Company to issue materially false and misleading statements, and omitted to disclose

information necessary to make such statements not false and misleading.

45.    For instance, on February 26, 2007, the Company filed its Form 10-K for fiscal

year 2006, which included results for the fourth quarter and full year 2006, and included the

same financial results as previously reported. The Form 10-K stated in pertinent part as follows:

> During 2006, our GMI business generated record-setting financial performance by
> continuing to serve clients well, take measured principal risk and execute on a
> variety of key growth initiatives around the world. Every major GMI business
> produced revenue growth over 2005 against a market backdrop that was favorable
> for most of the year. Across all businesses, GMI had a net increase of more than
> 200 managing directors and directors and 280 vice presidents to its headcount.
>
> In FICC, we continued to broaden the scope of the commodities trading business
> in terms of product, geography, and linkage to the broader client franchise,
> including trading in oil and metals and geographically in the Pacific Rim. We also
> enhanced our structured finance business with three strategic transactions in the
> U.S., United Kingdom and South Korea that we expect to provide additional
> sources of origination and servicing for our non-prime mortgage-backed
> securitization and trading platform. We also made progress in key investment
> areas including both interest rate and credit derivatives, principal investing/real
> estate, and foreign exchange.
>
> Within FICC, on September 5, 2006, we announced an agreement to acquire the
> First Franklin mortgage origination franchise and related servicing platform from
> National City Corporation. We expect First Franklin to accelerate our vertical
> integration in mortgages, adding scale to our mortgage securitization and trading
> platform. This acquisition was completed on December 30, 2006, the first day of
> our 2007 fiscal year.
>
> In Equity Markets, we continued to enhance our leading cash equity trading
> platform by adding to our portfolio and electronic trading capabilities through
> additional investments in personnel and technology, as well as additional
> acquisitions, partnerships and investments. We also made progress in our equity-

linked trading business, another key area of investment which increased its revenues more than 50% in 2006. Our equity financing and services business, which includes prime brokerage, set a revenue record in 2006 and continued to gain scale as we further expanded our relationships with hedge funds. The strategic risk group, our distinct proprietary trading business, also generated record revenues, benefiting from continued investments in personnel and infrastructure that provided the capabilities to take more risk when market opportunities arose. We also continued to generate increased revenues and make significant new investments in our private equity business.

46.      On April 19, 2007, Merrill Lynch issued its financial results for the first quarter of

2007. The press release announcing the financial results stated in pertinent part as follows:

Merrill Lynch (**NYSE: MER**) today reported strong growth in net earnings and earnings per diluted share for the first quarter of 2007, driven by net revenues of $9.9 billion. Net revenues were up 24 percent from the prior-year period and up 14 percent from the fourth quarter of 2006, with increases both year over year and sequentially in both Global Markets & Investment Banking (GMI) and Global Wealth Management (GWM), and in all global regions. These are the second-highest quarterly net revenues Merrill Lynch has ever generated, only $51 million lower than in the third quarter of 2006, when net revenues included a $2.0 billion one-time, pretax gain arising from the merger of Merrill Lynch Investment Managers (MLIM) with BlackRock, Inc. (NYSE: BLK).

First-quarter 2007 net earnings per diluted share were $2.26, up 414 percent from 44 cents for the first quarter of 2006, or 37 percent on an operating basis, which excludes $1.2 billion, after taxes, of one-time compensation expenses from the 2006 first quarter. Net earnings per diluted share were down 6 percent from $2.41 for the fourth quarter of 2006. First-quarter 2007 net earnings were $2.2 billion, up 354 percent from the first quarter of 2006, or up 31 percent excluding the one-time expenses in the prior-year period. Net earnings were down 8 percent from the fourth quarter of 2006, which included a lower compensation expense ratio. The pretax profit margin for the first quarter of 2007 was 31.4 percent, and the annualized return on average common equity was 23.3 percent. At the end of the first quarter, book value per share was $41.95, up 13 percent from the end of the first quarter of 2006 and 1 percent from the end of 2006.

"This was a terrific quarter. In an environment which was volatile at times, we took full advantage of market opportunities and delivered value to our clients and our shareholders," said Stan O'Neal, chairman and chief executive officer. "Our product capabilities and geographic reach are stronger and broader now than at any point in our history, and we continue to make investments to further enhance our franchise. We remain focused on disciplined growth to capitalize on the positive secular trends we continue to see unfold."

**Business Segment Review:**

In the first quarter of 2006, Merrill Lynch recorded $1.8 billion, before taxes ($1.2 billion after taxes), in one-time compensation expenses. These expenses were recorded in the business segments as follows: $1.4 billion to Global Markets & Investment Banking, $281 million to Global Wealth Management and $109 million to Merrill Lynch Investment Managers (which ceased to exist as a business segment upon its merger with BlackRock). Comparisons to that period in the following discussion of business segment results exclude the impact of these one-time expenses. A reconciliation of these segment results appears on Attachment III to this release.

## Global Markets & Investment Banking (GMI)

GMI generated record revenues, both over all and in each of its three major business lines, for the first quarter of 2007, as the business continued to execute on targeted organic and inorganic investments for diversification and profitable growth, executed with strong operating discipline in a favorable market environment. Non-U.S. revenues, which continue to comprise more than half of GMI's total net revenues, grew significantly faster than U.S. revenues in the period.

- GMI's first-quarter 2007 net revenues were a record $6.5 billion, up 43 percent from the year-ago quarter. Compared with the first quarter of 2006, net revenues increased in all three major business lines:

  - Fixed Income, Currencies and Commodities (FICC) net revenues increased 36 percent to a record $2.8 billion driven by nearly every major revenue category, as revenues from credit products, real estate, interest rate products and currencies grew to record levels. Revenues from trading commodities also increased significantly. Revenues from mortgage-related activities declined, resulting from a difficult environment for the origination, securitization and trading of non-prime mortgage loans and securities in the U.S. Revenues from activities related to U.S. non-prime mortgages, in aggregate, comprised less than 1 percent of Merrill Lynch's total net revenues over the past five quarters.

  - Equity Markets net revenues increased 50 percent to a record $2.4 billion, driven by every major business line, including a strong increase from private equity and record revenues from both the equity-linked and proprietary trading businesses.

  - Investment Banking net revenues increased 47 percent to a record $1.4 billion, as record revenues in debt origination were

14

complemented by strong growth in revenues from both merger and acquisition advisory services and equity origination.

- Pretax earnings for GMI were $2.3 billion, up 48 percent from the year-ago quarter, driven by the strong revenue growth. The first-quarter 2007 pretax profit margin was 35.8 percent, up from 34.7 percent in the prior-year period.

**Global Wealth Management (GWM)**

GWM generated strong revenue and pretax earnings growth in the first quarter of 2007. The growth was driven by Global Private Client (GPC), which increased its net revenues year over year for the 10th consecutive quarter, as well as by the contribution of Global Investment Management (GIM), including earnings from Merrill Lynch's investment in BlackRock. GPC continues to focus on delivering a superior product and service offering, positioning Merrill Lynch financial advisors (FAs) as essential partners to their clients. GPC also continues to invest in technology to further enhance both the efficiency and effectiveness of the FA force, and to invest in growing the FA census globally.

- GWM's first-quarter 2007 net revenues were $3.4 billion, up 16 percent from the first quarter of 2006:

  - GPC's net revenues increased 11 percent to $3.1 billion, driven by every major revenue category, including record fee-based revenues, which reflected higher asset values and net flows into annuitized-revenue products. Transaction and origination revenues also increased, driven by new issue origination activity, and net interest revenues grew to a new record level.

  - GIM's net revenues increased 151 percent to $261 million, due primarily to revenues from Merrill Lynch's investment in BlackRock, which began to contribute to revenues during the 2006 fourth quarter, as well as increases in revenues from Merrill Lynch's ownership positions in other investment management companies and the business that creates alternative investment products for GPC clients.

- Pretax earnings for GWM in the first quarter of 2007 were $842 million, up 31 percent from the first quarter of 2006, driven by the growth in revenues. The pretax profit margin was 24.7 percent, up from 21.9 percent in the prior-year period, driven by the impact of the investment in BlackRock.

15

- Turnover among FAs, especially top-producing FAs, remained low. FA headcount reached 15,930 at quarter-end, as GPC continued to exercise discipline in recruiting and training high-quality FAs.

- Client assets in products that generate annuitized revenues ended the quarter at $633 billion, up 13 percent from the first quarter of 2006, and total client assets in GWM accounts were a record $1.6 trillion, up 10 percent. Net inflows of client assets into annuitized-revenue products were $16 billion for the first quarter, and total net new money was $16 billion.

- On January 29, 2007, Merrill Lynch announced that it had reached a definitive agreement to acquire First Republic Bank (NYSE: FRC), a private banking and wealth management firm focused on high-net-worth individuals and their businesses, for approximately $1.8 billion in cash and stock.

47.    Following the Company's announcement regarding its financial results for fiscal 2006, Merrill Lynch's stock traded above $90 at the end of April.

48.    In June 2007, Defendant O'Neal attended a conference in London where he stated that problems in the subprime area were "reasonably well contained", and that there "have been no clear signs it's spilling over into other subsets of the bond market, the fix-income market and the credit market."

49.    On July 17, 2007, the Company issued a press release announcing its financial results for the second quarter of 2007. The press release stated in pertinent part as follows:

Merrill Lynch (NYSE: MER) today reported very strong net revenues, net earnings and earnings per diluted share for the second quarter of 2007, which enabled the company to achieve record net revenues, net earnings and net earnings per diluted share for the first half of 2007.

Second-quarter 2007 total net revenues of $9.7 billion increased 19 percent from $8.2 billion in the prior-year period and were down 1 percent from $9.9 billion in the first quarter of 2007. Year-over-year, strong revenue growth in both Global Markets & Investment Banking (GMI) and Global Wealth Management (GWM), as well as across all global regions, drove the increase. These are the highest net revenues Merrill Lynch has ever generated in a fiscal second quarter and the second highest the firm has generated for any quarterly period on an operating basis, excluding from the comparison the $2.0 billion one-time, pretax gain that

arose from the merger of Merrill Lynch Investment Managers with BlackRock, Inc. (NYSE: BLK) in the third quarter of 2006.

Second-quarter 2007 net earnings per diluted share were $2.24, up 37 percent from $1.63 in the second quarter of 2006 and down less than 1 percent from $2.26 for the first quarter of 2007. Net earnings were $2.1 billion, up 31 percent from the second quarter of 2006 and down 1 percent from the first quarter of 2007. The pretax profit margin for the second quarter of 2007 was 31.1 percent, up 2.4 percentage points from the prior-year period, and the annualized return on average common equity was 22.4 percent, up 3.8 points. At the end of the second quarter, book value per share was $43.55, up 17 percent from the end of the second quarter of 2006.

"We delivered another strong quarter in a volatile and, at times, hostile market environment," said **Stan O'Neal**, chairman and chief executive officer of Merrill Lynch. "These results reflect our revenue diversification, which makes possible strong performance despite uneven market conditions. Our focus on business and revenue growth, expense discipline and global expansion continues to enhance the earnings power of our franchise."

Net revenues for the first six months of 2007 set a record, at $19.6 billion, up 21 percent from $16.1 billion in the first half of 2006. Record net earnings per diluted share of $4.50 were up 117 percent from $2.07 in the prior-year period, while net earnings of $4.3 billion were up 104 percent. Results for the first six months of 2006 included $1.2 billion, after taxes, of one-time compensation expenses incurred in the first quarter of that period. Excluding those expenses, net earnings per diluted share were up 37 percent from the prior-year period, while net earnings were up 31 percent. The first-half pretax profit margin was 31.2 percent, up 13 percentage points from the first half of 2006, or 2.1 percentage points excluding the one-time expenses. The annualized return on average common equity was 22.8 percent, up 10.9 percentage points from the first six months of 2006, or 3.8 points excluding the one-time expenses.

**Business Segment Review:**

In the first quarter of 2006, Merrill Lynch recorded $1.8 billion, before taxes ($1.2 billion after taxes), in one-time compensation expenses. These expenses were recorded in the business segments as follows: $1.4 billion to Global Markets & Investment Banking, $281 million to Global Wealth Management and $109 million to Merrill Lynch Investment Managers (which ceased to exist as a business segment upon its merger with BlackRock). Comparisons to first-half 2006 results in the following discussion of business segment results exclude the impact of these one-time expenses. A reconciliation of these segment results appears on Attachment IV to this release.

**Global Markets & Investment Banking (GMI)**

17

- GMI's second-quarter 2007 net revenues were $6.2 billion, up 36 percent from the second quarter of 2006, as net revenues increased in all three major business lines:

    - Fixed Income, Currencies and Commodities (FICC) net revenues increased 55 percent to $2.6 billion, driven primarily by strong growth in net revenues from trading credit products, interest rate products and commodities, partially offset by a decline in net revenues from the structured finance and investments business, which includes mortgage-related activities. For the first six months of 2007, FICC generated a record $5.4 billion in net revenues, up 45 percent from 2006, reflecting increased diversity and depth across asset classes.

    - Equity Markets net revenues increased 15 percent to $2.1 billion, driven by nearly every major business line. Revenues from equity-linked trading, cash trading, financing and services, and proprietary trading all increased strongly over the prior-year quarter, while revenues from the firm's private equity business were meaningfully lower. For the first half of 2007, net revenues were a record $4.5 billion, up 31 percent from the prior-year period.

    - Investment Banking net revenues increased to a record level for the third consecutive quarter, up 41 percent to $1.4 billion, as record revenues in equity origination were complemented by strong growth in revenues from both merger and acquisition advisory services and debt origination. Investment Banking net revenues for the first six months of 2007 were $2.8 billion, up 44 percent from the 2006 period, reflecting the tremendous momentum in Merrill Lynch's global origination franchise.

Second-quarter 2007 pretax earnings for GMI were $2.1 billion, up 43 percent from the year-ago quarter, driven by the strong revenue growth and continued focus on expenses. The pretax profit margin was 34.0 percent, up from 32.1 percent in the prior-year period.

- GMI's net revenues for the first six months of 2007 were a record $12.7 billion, up 39 percent from the first half of 2006, driven by record revenues in nearly every major line of business. Pretax earnings were $4.4 billion, up 46 percent from the prior-year period. The pretax profit margin was 34.9 percent, compared with 33.4 percent in the first half of 2006.

**Global Wealth Management (GWM)**

GWM generated record revenues and pretax earnings for both the second quarter and first half of 2007, driven by Global Private Client (GPC), as well as by the contribution of Global Investment Management (GIM), which includes earnings from Merrill Lynch's investment in BlackRock.

- GWM's second-quarter 2007 net revenues were $3.6 billion, up 18 percent from the second quarter of 2006:

    - GPC's net revenues increased 13 percent to $3.3 billion, driven by every major revenue category, including record fee-based revenues, which reflected higher asset values and net flows into annuitized-revenue products, as well as strong transaction and origination revenues. Net interest revenues also increased. For the first six months of 2007, GPC's net revenues increased 12 percent over the prior-year period to a record $6.5 billion.

    - GIM's net revenues increased 119 percent to $305 million, due primarily to revenues from Merrill Lynch's investment in BlackRock, which began to contribute to revenues during the 2006 fourth quarter, as well as increases in revenues from Merrill Lynch's ownership positions in other investment management companies and the business that creates alternative investment products for GPC clients. GIM's net revenues for the first half of 2007 were a record $566 million, up 133 percent from the 2006 first half.

    Second-quarter 2007 pretax earnings were $1.0 billion, up 39 percent from the second quarter of 2006, driven by the growth in revenues. The pretax profit margin was 27.9 percent, up from 23.7 percent in the prior-year period, driven by the impact of the investment in BlackRock and continued discipline in managing expenses.

- Turnover among financial advisors remained near historical lows, particularly among top-producing FAs. FA headcount reached 16,200 at quarter-end, reflecting an increase of 270 FAs for the quarter, as GPC continued to successfully execute its strategy for recruiting and training high-quality FAs.

- Client assets in products that generate annuitized revenues ended the quarter at $668 billion, up 19 percent from the second quarter of 2006, and total client assets in GWM accounts were a record $1.7 trillion, up 14 percent. Net inflows of client assets into annuitized-revenue products were $12 billion for the second quarter, and total net new money was $9 billion, reflecting the impact of client income-tax payments.

- For the first six months of 2007, GWM's net revenues increased 17 percent, to a record $7.0 billion, driven by the record revenues in both GPC and GIM. Pretax earnings increased 35 percent to $1.9 billion, demonstrating the continued operating leverage in this business. GWM's year-to-date pretax profit margin was 26.4 percent, up 3.6 percentage points from 22.8 percent in the first half of 2006.

**Merrill Lynch Investment Managers (MLIM)**

On September 29, 2006, Merrill Lynch merged MLIM with BlackRock in exchange for a total of 65 million common and preferred shares representing an economic interest of approximately half of the newly combined BlackRock. Following the merger, the MLIM business segment ceased to exist, and under the equity method of accounting, an estimate of the net earnings associated with Merrill Lynch's ownership position in BlackRock is recorded in the GIM portion of the GWM segment. For the second quarter of 2006, MLIM's net revenues were $630 million, and its pretax earnings were $240 million. For the first six months of 2006, MLIM's net revenues were $1.2 billion and its pretax earnings were $462 million.

* * *

**Income Taxes**

Merrill Lynch's second-quarter effective tax rate was 29.2 percent, compared with 30.5 percent for the second quarter of 2006. The effective tax rate for the first six months of 2007 was 29.8 percent, compared with 28.3 percent in the prior-year period, or 30.1 percent excluding the one-time compensation expenses.

**Share Repurchases**

As part of its active management of equity capital, Merrill Lynch repurchased 19.8 million shares of its common stock for $1.8 billion during the second quarter of 2007, completing the $5 billion repurchase program authorized in October 2006 and utilizing $557 million of the $6 billion repurchase program authorized in April 2007.

50.    During July of 2007, the problems in the housing market, coupled with a burgeoning credit crisis, led to significant declines in the stock prices of many financial institutions. However, Merrill Lynch's stock, while declining, remained at artificially inflated levels due to the false and misleading statements and financial results issued and publicly disseminated by the Individual Defendants during the Relevant Period.

20

51.     Merrill Lynch's statements during the Relevant Period were materially false and misleading because they failed to disclose and misrepresented the following material, adverse information:

a.     That the Company was more exposed to CDOs backed by high-risk subprime debt than it publicly disclosed; and

b.     That the Defendants' failed to inform the market of the extent of likely write downs in the Company's CDO portfolio due to the deteriorating subprime mortgage market, which caused Merrill Lynch's portfolio to be impaired.

52.     The Individual Defendants had actual knowledge of the foregoing material, adverse non-public information concerning the Company during the Relevant Period.   The Individual Defendants also knew, consciously disregarded, were reckless and grossly negligent in not knowing, or should have known that the Company's statements during the Relevant Period were false and materially misleading because of Defendants' failure to disclose the foregoing material, adverse information concerning Merrill Lynch's financial predicament and the true state of its business prospects.

### The Truth Is Revealed

53.     On October 5, 2007, Merrill Lynch announced that it would write down the value of its CDO portfolio by $4.5 billion, and estimated that it would lose as much as 50 cents per share.  Although the news was surprising in that most analysts expected a profit for the Company of around $2 a share, other banks were announcing similar mortgage-related charges in the third quarter of 2007.

54.     Defendant O'Neal, commenting on the announcement, stated that "[d]espite solid underlying performances in most of our businesses in the third quarter, the impact of this

21

difficult market was much more severe in certain of our FICC [fixed income, currencies and commodities] business than we expected earlier in the quarter."

55.     However, on October 24, 2007, prior to the market opening, Merrill Lynch issued a press release announcing that the Company would take a third-quarter charge of $8 billion instead of $5 billion. The write down amounted to about one-eighth of the total value of the Company at the end of the quarter. In addition to a $463 million write down on leverage-buyout commitments, the Company's total write downs for the third quarter of 2007 would be over $8.3 billion. Merrill Lynch also announced a loss of $2.2 billion, or $2.85 per share, for the quarter – the biggest quarterly loss in its 93-year history. The loss was nearly six times the size of the loss that the Company had forecasted just three weeks earlier. The press release stated in pertinent part as follows:

> Merrill Lynch (**NYSE: MER**) today reported a net loss from continuing operations for the third quarter of $2.3 billion, or $2.85 per diluted share, significantly below net earnings of $2.22 per diluted share for the second quarter of 2007 and $3.14 for the third quarter of 2006. Third-quarter 2006 net earnings per diluted share, excluding the impact of the one-time, after-tax net benefit of $1.1 billion ($1.8 billion pretax) related to the merger of Merrill Lynch Investment Managers (MLIM) and BlackRock (NYSE: BLK), were $1.97. Third-quarter 2007 results reflect significant net write-downs and losses attributable to Merrill Lynch's Fixed Income, Currencies & Commodities (FICC) business, including write-downs of $7.9 billion across CDOs and U.S. subprime mortgages, which are significantly greater than the incremental $4.5 billion write-down Merrill Lynch disclosed at the time of its earnings pre-release. These write-downs and losses were partially offset by strong revenues in Global Wealth Management (GWM), Equity Markets and Investment Banking, particularly in regions outside of the U.S. The results described above and herein, exclude Merrill Lynch Insurance Group (MLIG), which is reported under discontinued operations.
>
> Third-quarter 2007 total net revenues of $577 million decreased 94 percent from $9.8 billion in the prior-year period and were down 94 percent from $9.7 billion in the second quarter of 2007. Merrill Lynch's third-quarter 2007 pretax net loss was $3.5 billion. At the end of the third quarter, book value per share was $39.75, down slightly from the end of the third quarter of 2006.

22

"Mortgage and leveraged finance-related write-downs in our FICC business depressed our financial performance for the quarter. In light of difficult credit markets and additional analysis by management during our quarter-end closing process, we re-examined our remaining CDO positions with more conservative assumptions. The result is a larger write-down of these assets than initially anticipated," said **Stan O'Neal**, chairman and chief executive officer. "We expect market conditions for subprime mortgage-related assets to continue to be uncertain and we are working to resolve the remaining impact from our positions," Mr. O'Neal continued. "Away from the mortgage-related areas, we continue to believe that secular trends in the global economy are favorable and that our businesses can perform well, as they have all year."

Net revenues for the first nine months of 2007 were $20.0 billion, down 23 percent from $25.8 billion in the comparable 2006 period. Net earnings per diluted share of $1.94 were down 62 percent from $5.12 in the prior-year period, and net earnings of $2.0 billion were down 61 percent. Results for the first nine months of 2006 included $1.2 billion of one-time, after-tax compensation expenses ($1.8 billion pretax) related to the adoption of Statement of Financial Accounting Standards No. 123R ("one-time compensation expenses") incurred in the first quarter of 2006, as well as the net benefit associated with the MLIM merger. Excluding these one-time items, net revenues for the first nine months of 2007 were down 16 percent, net earnings per diluted share were down 63 percent and net earnings were down 62 percent from the prior-year period. The pretax profit margin for the first nine months was 12.8 percent, down 14.2 percentage points from the comparable 2006 period, or down 16.3 percentage points excluding the one-time items. The annualized return on average common equity was 6.5 percent, down 13.0 percentage points from the first nine months of 2006, or down 13.4 percentage points excluding the one-time items.

**Business Segment Review:**

In the first quarter of 2006, Merrill Lynch recorded the one-time compensation expenses (pretax) in the business segments as follows: $1.4 billion to Global Markets and Investment Banking, $281 million to Global Wealth Management and $109 million to Merrill Lynch Investment Managers (which ceased to exist as a business segment upon its merger with BlackRock). The one-time net benefit associated with the MLIM merger was recorded in the Corporate Segment. Comparisons to results from the third quarter and first nine months of 2006 in the following discussion of business segment results exclude the impact of these one-time items. A reconciliation of these segment results appears on Attachment V to this release.

**Global Markets & Investment Banking (GMI)**

GMI recorded negative net revenues and a pretax loss for the third quarter of 2007 of $3.0 billion and $4.4 billion, respectively, as strong net revenues from Equity

Markets and Investment Banking were more than offset by the net losses in FICC. GMI's third quarter net revenues also included a net benefit of approximately $600 million due to the impact of the widening of Merrill Lynch's credit spreads on the carrying value of certain long-term debt liabilities.

- Third-quarter and year-to-date 2007 net revenues from GMI's three major business lines were as follows:

    - FICC net revenues were negative $5.6 billion for the quarter, impacted primarily by losses across CDOs and U.S. subprime mortgages. These positions consist of CDO trading positions and warehouses, as well as U.S. subprime mortgage related whole loans, warehouse lending, residual positions and residential mortgage backed securities. See below for details.

                                    * * *

        ***Third-quarter write-downs of $7.9 billion across CDOs and U.S. subprime mortgages are significantly greater than the incremental $4.5 billion write-downs Merrill Lynch disclosed at the time of its earnings pre-release. This is due to additional analysis and price verification completed as part of the quarter-end closing process, including the use of more conservative loss assumptions in valuing the underlying collateral.***

        FICC net revenues were also impacted by write-downs of $967 million on a gross basis, and $463 million net of related fees, related to all corporate and financial sponsor, non-investment grade lending commitments, regardless of the expected timing of funding or closing. These commitments totaled approximately $31 billion at the end of the third quarter of 2007, a net reduction of 42 percent from $53 billion at the end of the second quarter. The net losses related to these commitments were limited through aggressive and effective risk management, including disciplined and selective underwriting and exposure reductions through syndication, sales and transaction restructurings.

        Other FICC businesses reported strong results with record net revenues in interest rates and currencies and solid results in commodities and commercial real estate.

        For the first nine months of 2007, FICC net revenues were negative $153 million as strength in interest rate products, currencies and commercial real estate was more than offset by declines in credit products and the structured finance and investments business.

                                    24

- Equity Markets net revenues increased 4 percent from the prior-year quarter to $1.6 billion, driven by substantial growth in client volumes. Revenues from cash trading, equity-linked trading, and financing and services were significantly higher compared to the prior-year period, while revenues declined in the Strategic Risk Group and the private equity business. Excluding the private equity business, net revenues for the remaining Equity Markets businesses increased 40 percent from the 2006 third quarter. For the first nine months of 2007, Equity Markets net revenues were a record $6.1 billion, up 23 percent from the prior-year period, driven by strength in cash equities, equity-linked and the financing and services businesses.

- Investment Banking generated record net revenues for a fiscal third quarter, up 23 percent from the prior-year period to $1.0 billion. Revenues were driven by growth in both merger and acquisition advisory services and equity origination, partially offset by declines in debt origination. Investment Banking net revenues for the first nine months of 2007 were a record $3.8 billion, up 38 percent from the 2006 period, reflecting the momentum in Merrill Lynch's global origination franchise. Compared with the first nine months of 2006, significant increases in acquisition advisory services, equity and debt origination, more than offset a decline in leveraged finance origination revenues.

- The third-quarter 2007 pretax net loss for GMI was $4.4 billion compared with $1.5 billion of pretax earnings in the prior-year period.

- GMI's net revenues for the first nine months of 2007 were $9.7 billion, down 28 percent from the record prior-year period. Pretax earnings were $6 million, down from $4.5 billion in the prior-year period.

56.    Immediately after Merrill Lynch released this adverse information, the Company's shares dropped from $67.12 per share to an intra-day low of $61.40 per share, closing at $63.22 per share on volume of 52 million shares.

57.    During a conference call on October 24, 2007 regarding the announcement, Defendant O'Neal stated that he was "not going to talk around the fact that some mistakes were made", and that he was "accountable for the mistakes" and "accountable for the performance of the firm overall."

25

58.    In an October 25, 2007 article in *The Wall Street Journal* headlined "O'Neal Faces Grilling As Losses Far Exceed Projection Made Oct. 5," further details began to spill out which indicated that Merrill Lynch's management were aware of the risks which led to the write down, but had concealed such details, ignored the warning signs and continued to make investments in CDOs in an effort to continue reaping rewards from the lucrative fees these investments generated.  The article states that "[f]or Merrill, the fees it earned arranging deals were too lucrative to give up."

59.    The article also quotes Win Smith, the son of one of the firm's founding partners, as stating that Merrill Lynch "was a great firm with a great franchise and it is not being led well", and that the Company "is in need of the right leadership for the future."  The article further stated that the "$8.4 billion hit leaves it clear that Mr. O'Neal and his team didn't always appreciate the risks they took to achieve the greater profits," and that, during the conference call referenced above, analysts "pushed Merrill to say whether it had cut its exposure by selling the CDOs or by buying hedges in an attempt to balance future losses.  Mr. O'Neal declined to give a breakdown."

60.    On October 25, 2007, and as a result of the write down, S&P reduced Merrill Lynch's credit rating to negative, causing the Company's stock price to drop to $60.90 per share. In addition, Moody's Investor Service and other agencies downgraded the Company's credit and debt ratings.

### Defendant O'Neal Is Ousted

61.    Despite the massive write down and losses that the Company was enduring, as well as the fact that, during his tenure, the Company lagged behind competitors such as Morgan Stanley and Goldman Sachs in annual returns, Defendant O'Neal remained at the helm of the

26

Company, and there was little immediate calling among the Director Defendants for O'Neal's ouster.

62.    However, this all changed on October 26, 2007, when the *New York Times* reported that O'Neal had contacted the Chief Executive Officer of one of the Company's competitors, Wachovia Bank, about a potential merger, and did so without obtaining approval from or even informing the Company's Board.  This stunning breach of loyalty to the Board raised concerns that Defendant O'Neal was attempting to broker a change of control of the Company pursuant to which he would stand to reap a windfall severance payment of $250 million.

63.    After news of O'Neal's contact with Wachovia Bank became public, rumors quickly swirled that the Board would finally fire O'Neal.  However, instead of firing O'Neal, the Director Defendant incredibly allowed him to broker a "retirement" package that was, once again, in furtherance of his own best interests rather than the best interests of the Company. Accordingly, on October 30, 2007, Merrill Lynch announced that O'Neal had retired, effective immediately, and that the Director Defendants had awarded O'Neal with a retirement package worth more than $160 million.  After a tenure marked by ultimately flat performance, an $8 billion write down, and a $2.2 billion loss in the third quarter of 2007 – the largest in the firm's 93-year history – the Director Defendants allowed O'Neal to simply walk away from the Company with a windfall payment guised as a retirement package.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

64.    Plaintiff is an owner of Merrill Lynch common stock and was an owner of Merrill Lynch common stock at all times relevant to Defendants' wrongful course of conduct alleged herein.

27

65.    Plaintiff brings this action derivatively in the right and for the benefit of Merrill Lynch to redress injuries suffered, and to be suffered, by Merrill Lynch as a direct result of the breaches of fiduciary duty, waste of corporate assets, unjust enrichment and violations of New York state law, as well as the aiding and abetting thereof, by the Individual Defendants.

66.    Merrill Lynch is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

67.    Plaintiff will adequately and fairly represent the interests of Merrill Lynch in enforcing and prosecuting its rights.

68.    Merrill Lynch's Board of Directors is currently composed of nine (9) directors – Defendants Christ, Codina, Colbert, Cribiore, Finnegan, Jonas, Prueher, Reese and Rossotti. Each of these directors has been named as a defendant in this action.

69.    The Director Defendants owed a duty to Merrill Lynch and its shareholders to be reasonably informed about the business and operations of the Company.    The Director Defendants completely abdicated their oversight duties to the Company by failing to implement internal procedures and controls necessary to prevent the wrongdoing alleged herein.

70.    Demand on the Merrill Lynch Board of Directors to institute this action is not necessary because such a demand would be a futile and useless act, particularly for the additional following reasons:

a.    The Director Defendants, as detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred, and participated in efforts to conceal or disguise those wrongs from Merrill Lynch stockholders and investors and are, therefore, not disinterested parties and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

28

b.    The Director Defendants had a responsibility and obligation to assure that all press releases and filings, including all financial reports, were accurate and that all internal controls and other oversight procedures were in place that would have detected and prevented the false and misleading statements put out by the Company to the public that are further described in this Complaint;

c.    In order to bring this suit, the Director Defendants would be forced to sue themselves and/or persons with whom they have extensive business and/or personal entanglements, which they will not do;

d.    The acts complained herein of constitute violations of New York state law and the fiduciary duties owed by the Director Defendants and are incapable of ratification;

e.    The Director Defendants are currently defendants in other securities class action lawsuits arising out of the wrongdoing alleged herein and a suit by them to remedy the wrongs alleged herein would likely expose them to liability in the securities class actions; thus, they are hopelessly conflicted in making any supposedly independent determination as to whether to sue themselves and the other Defendants;

f.    The actions of the Director Defendants have impaired the Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept Plaintiff's demands;

g.    The misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment;

h.    Merrill Lynch has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein; yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful course of

29

conduct, nor have they attempted to recover any part of the damages Merrill Lynch suffered and will suffer thereby; and

i.      Accordingly, the Director Defendants are so personally and directly conflicted and committed to the unlawful course of conduct in dispute that they cannot reasonably be expected to respond to a demand in good faith and within the ambit of the business judgment rule.

71.    Plaintiff has not made any demand on the shareholders of Merrill Lynch to institute this action since such demand would be a futile and useless act for the following reasons:

a.      Merrill Lynch is a publicly traded company with thousands of shareholders;

b.      Making demand on such a number of shareholders would be impossible for Plaintiff, who has no way of finding out the names, addresses or telephone numbers of shareholders; and

c.      Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could even be individually identified.

72.    Plaintiff will adequately and fairly represent the interests of Merrill Lynch in enforcing and prosecuting its rights.

**FIRST CAUSE OF ACTION**
**Derivative Claim for Breach of Fiduciary Duty**
**(Against All Defendants)**

73.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

74.     The Defendants owed a fiduciary duty to Merrill Lynch to supervise the issuance of its press releases and financial reporting to ensure that they were truthful and accurate and that they conformed with New York state law.

75.     The Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Merrill Lynch's internal controls and by allowing misleading statements and filings to be issued and disseminated.  Defendants abused their ability to control and influence Merrill Lynch, for which they are legally responsible.

76.     The Defendants have engaged, knowingly or recklessly, in a sustained and systematic failure to exercise their oversight responsibilities to ensure that Merrill Lynch complied with New York state laws, rules and regulations.

77.     As members of the Board of Directors of Merrill Lynch, the Director Defendants were directly responsible for authorizing or permitting the authorization of, or failing to monitor, the practices which resulted in violations of the New York state laws as alleged herein.  Each of them had knowledge of and actively participated in and/or approved of or acquiesced in the wrongdoings alleged herein or abdicated his/her responsibilities with respect to these wrongdoings.  The alleged acts of wrongdoing have subjected Merrill Lynch to unreasonable risks of loss and expenses.

78.     Each of the Defendants' acts in causing or permitting the Company to disseminate to the investing public material misrepresentations and omissions and abdicating his oversight responsibilities to the Company has subjected the Company to liability for violations of New York state law, and therefore was not the product of a valid exercise of business judgment and was a complete abdication of their duties as officers and/or directors of the Company.  As a result of the Defendants' unlawful course of conduct and breaches of fiduciary duty, Merrill

Lynch has sustained substantial economic losses, is the subject of major securities fraud class action lawsuits by defrauded investors, and has had its reputation in the business community and financial markets irreparably tarnished.

79.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

80.    By reason of the foregoing, Merrill Lynch was damaged.

81.    Plaintiff, on behalf of Merrill Lynch, has no adequate remedy at law.

## SECOND CAUSE OF ACTION
### For Gross Mismanagement
### (Against All Defendants)

82.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

83.    Defendants had a duty to Merrill Lynch and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of the Company.

84.    Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of Merrill Lynch in a manner consistent with the duties imposed upon them by law. By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence, and candor in the management and administration of Merrill Lynch's affairs and in the use and preservation of Merrill Lynch's assets.

85.    During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Merrill Lynch to engage in the scheme complained of herein which they knew had an

32

unreasonable risk of damage to Merrill Lynch, thus breaching their duties to the Company. As a result, Defendants grossly mismanaged Merrill Lynch.

86.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

87.    By reason of the foregoing, Merrill Lynch was damaged.

88.    Plaintiff, on behalf of Merrill Lynch, has no adequate remedy at law.

## THIRD CAUSE OF ACTION
### For Contribution and Indemnification
### (Against All Defendants)

89.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

90.    Merrill Lynch is alleged to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein that give rise to Defendants' liability to Merrill Lynch.

91.    Merrill Lynch's alleged liability on account of the wrongful acts, practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of the Defendants as alleged above, and Merrill Lynch is entitled to contribution and indemnification from each of the Defendants in connection with all such claims that have been, are or may in the future be asserted against Merrill Lynch by virtue of the Defendants' misconduct.

## FOURTH CAUSE OF ACTION
### For Abuse of Control
### (Against All Defendants)

92.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

33

93.    The Defendants owed duties as controlling persons to Merrill Lynch's public shareholders not to use their positions of control within the Company for their own personal interests and contrary to the interest of the Company's public shareholders.

94.    The conduct of Defendants amounted to an abuse of their abilities to control Merrill Lynch in violation of their obligations to Merrill Lynch and the Company's public shareholders.

95.    As a result of Defendants' abuse of control, Merrill Lynch has sustained and will continue to sustain irreparable injury, for which there is no adequate remedy at law.

### FIFTH CAUSE OF ACTION
#### For Waste of Corporate Assets
#### (Against All Defendants)

96.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

97.    The Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of Merrill Lynch's internal controls and by allowing misleading statements and filings to be issued and disseminated.

98.    As a result of Defendants' breaches of fiduciary duties, Merrill Lynch has wasted valuable corporate assets through payments of incentive-based compensation to certain of its executive officers and has incurred significant potential liability for legal costs, penalties, fines, and/or legal fees in connection with the defense of Defendants' unlawful course of conduct complained of herein.

99.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

100.    By reason of the foregoing, Merrill Lynch was damaged.

34

101.    Plaintiff, on behalf of Merrill Lynch, has no adequate remedy at law.

## SIXTH CAUSE OF ACTION
### For Aiding and Abetting Breach of Fiduciary Duty
### (Against the Individual Defendants)

102.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

103.    In addition to directly breaching their fiduciary duty to the Company, the Individual Defendants aided and abetted the other Defendants' breaches of fiduciary duty in a grossly negligent, willful and reckless manner, as described above,

104.    These Defendants knowingly gave substantial assistance and encouragement to the other Defendants and each other in committing the grossly negligent, willful and reckless breach of fiduciary duties alleged above.

105.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

106.    By reason of the foregoing, Merrill Lynch was damaged.

107.    Plaintiff, on behalf of Merrill Lynch, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

(A)    Declaring that Defendants have breached and are breaching their fiduciary duties to Merrill Lynch and the Company's public shareholders;

(B)    Requiring an accounting of Merrill Lynch's corporate expenditures that have been made to benefit the Defendants personally and requiring the Defendants to return to Merrill Lynch all salaries and the value of other remuneration of whatever kind paid to them by the Company during the time they were in breach of the fiduciary duties they owed to Merrill Lynch;

35

(C)    Directing the Defendants to account to the Company for all damages sustained or to be sustained by the Company by reason of the wrongs alleged herein;

(D)    Awarding compensatory and/or punitive damages plus interest to the Company;

(E)    Directing the Defendants to pay interest at the highest rate allowable by law on the amount of damages sustained by the Company as a result of Defendants' culpable conduct;

(F)    Directing Merrill Lynch to adopt and implement procedures and processes to improve its corporate governance and internal procedures to comply with New York state laws;

(G)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

(H)    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: November 21, 2007                    By: _____
                                                Richard B. Brualdi

**The BRUALDI LAW FIRM, P.C.**
Richard B. Brualdi
Gaitri Boodhoo
Ayesha N. Onyekwelu
29 Broadway, Suite 2400
New York, New York 10006
Tel: (212) 952-0602
Fax: (212) 952-0608

*Attorneys for Plaintiff*

**SAXENA WHITE P.A**
Maya Saxena
Joseph E. White III
2424 North Federal Highway
Suite 257
Boca Raton, FL 33431
Tel: 561.394.3399
Fax: 561.394.3082

*Of Counsel*

Exhibit B

## CONSENT FOR REMOVAL

Defendants Carol T. Christ, Armando D. Codina, Virgis W. Colbert, Alberto

Cribiore, John D. Finnegan, Judith Mayhew Jonas, Joseph W. Prueher, Ann N. Reese and

Charles O. Rossotti consent to the removal of Operative Plasterers & Cement Masons

Local 262 Pension and Annuity Funds v. E. Stanley O'Neal, et al., Index No. 07-603860,

currently pending in the New York State Supreme Court in New York County to the

United States District Court for the Southern District of New York.

Dated: New York, New York
      December 6, 2007

                                        Gregory A. Markel
                                        Jason M. Halper
                                        CADWALADER, WICKERSHAM
                                           & TAFT LLP
                                        One World Financial Center
                                        New York, NY 10281
                                        T: (212) 504-6000

                                        Attorneys for Defendants Carol T. Christ,
                                        Armando D. Codina, Virgis W. Colbert,
                                        Alberto Cribiore, John D. Finnegan, Judith
                                        Mayhew Jonas, Joseph W. Prueher, Ann N.
                                        Reese and Charles O. Rossotti

## CONSENT FOR REMOVAL

Defendant Gregory J. Fleming consents to the removal of <u>Operative Plasterers &</u>

<u>Cement Masons Local 262 Pension and Annuity Funds v. E. Stanley O'Neal, et al.</u>, Index

No. 07-603860, currently pending in the New York State Supreme Court in New York

County to the United States District Court for the Southern District of New York.

Dated: New York, New York
       December ⎰, 2007

                              Joseph S. Allerhand
                              Jonathan D. Polkes
                              WEIL GOTSHAL & MANGES LLP
                              767 Fifth Avenue
                              New York, NY 10153
                              T: (212) 310-8000

                              Attorneys for Defendant Gregory J. Fleming

## CONSENT FOR REMOVAL

Defendant E. Stanley O'Neal consents to the removal of Operative Plasterers &

Cement Masons Local 262 Pension and Annuity Funds v. E. Stanley O'Neal, et al., Index

No. 07-603860, currently pending in the New York State Supreme Court in New York

County to the United States District Court for the Southern District of New York.

Dated: New York, New York
      December 6, 2007

                                    Michael J. Chepiga
                                    Paul C. Curnin
                                    SIMPSON THACHER & BARTLETT LLP
                                    425 Lexington Avenue
                                    New York, NY 10017-3954
                                    T: (212) 455-2000

                                    Attorneys for Defendant E. Stanley O'Neal

## CONSENT FOR REMOVAL

Defendant Ahmass L. Fakahany consents to the removal of <u>Operative Plasterers & Cement Masons Local 262 Pension and Annuity Funds v. E. Stanley O'Neal, et al.,</u> Index No. 07-603860, currently pending in the New York State Supreme Court in New York County, to the United States District Court for the Southern District of New York.

Dated: New York, New York
      December ⸻, 2007

                                            James N. Benedict
                                            George S. Canellos
                                            MILBANK TWEED, HADLEY
                                              & McCLOY LLP
                                            One Chase Manhattan Plaza
                                            New York, NY 10005-1413
                                            T: (212) 530-5000

                                            Attorneys for Defendant Ahmass L.
                                              Fakahany

## CONSENT FOR REMOVAL

Defendant Jeffrey N. Edwards consents to the removal of Operative Plasterers & Cement Masons Local 262 Pension and Annuity Funds v. E. Stanley O'Neal, et al., Index No. 07-603860, currently pending in the New York State Supreme Court in New York County to the United States District Court for the Southern District of New York.

Dated: New York, New York
      December ⁀, 2007

                           Michael R. Young
                           Mei Lin Kwan-Gett
                           WILLKIE FARR & GALLAGHER LLP
                           787 Seventh Avenue
                           New York, N.Y. 10019-6099
                           T: (212) 728-8000

                           Attorneys for Defendant Jeffrey N. Edwards